W. S. MILNE *v.* W. J. SANDERS *et ux.*

(*Nashville.* December Term, 1920.)

1. MASTER AND SERVANT. Finding supported by evidence in compensation case final.

The trial court's finding in a suit under the Workmen's Compensation Act will not be reversed if there is any evidence to support it. (*Post, p.* 620.)

Acts cited and construed: Acts 1919, ch. 123.

2. MASTER AND SERVANT. Intentional injury by fellow servant not compensable.

Generally, where an employee is intentionally injured by a fellow servant, there is no liability under the Workmen's Compensation Act. (*Post, p.* 620.)

3. MASTER AND SERVANT. Employer in compensation case had burden of proving fire intentionally set.

In a suit under the Workmen's Compensation Act for death of an employee in an oil room fire claimed by the employer to have been intentionally started by a fellow servant to burn the employee, the plaintiffs, by proving that the fire suddenly appeared when a lighted match was thrown into the room, shifted the burden to the employer to prove that the fire was intentionally started. (*Post, p.* 620.)

4. MASTER AND SERVANT. Evidence in compensation case held not to prove fire was intentionally set.

In a suit under the Workmen's Compensation Act for death of an employee in an oil room fire, evidence *held* to sustain finding that the fire was accidental and not intentionally set by a fellow servant who threw a lighted match into the room. (*Post, pp.* 620-622.)

5. MASTER AND SERVANT. Employee held acting "in course of employment."

Milne v. Sanders.

Where one of two brothers who were dipping chairs in a tank containing liquid wax was directed by the foreman to fill the tank with wax from the oil room, the death of the other brother as the result of an accident while assisting in filling the tank, without having been expressly ordered to so do, *held* to have arisen "out of and in the course of his employment." (*Post, pp.* 622-626.)

Cases cited and approved: McCormick v. A. T. Kelliher Lumber Co., 18 B. C. 57; McQuibban v. Menzies, 37 Sc. L. Rep., 526; Tobin v. Hearn (1910), 2 Ir., 639;

Case cited and distinguished: Spooner v. Detroit Saturday Night Co., 187 Mich., 125; Bischoff v. American Car, etc., Co., 190 Mich., 234.

6. EVIDENCE. Dying declarations not admissible in civil action.

In proceedings under the Workmen's Compensation Act for the death of an employee, dying declarations of the employee as to the cause of the fire which caused his death *held* not admissible; dying declarations not being admissible in a civil action. (*Post, pp.* 626, 627.)

7. EVIDENCE. Transcript of record in criminal case held inadmissible against plaintiffs not parties thereto.

In proceedings under the Workmen's Compensation Act for death of an employee in a fire, in which the employer claimed that the fire had been intentionally set by a fellow employee, the transcript of the record in a criminal case in which such fellow employee had been convicted of murder *held* properly excluded; the plaintiffs not having been parties to the criminal case, and having had no opportunity to cross-examine witnesses in such case, or to introduce evidence to rebut that offered by the State. (*Post, p.* 627.)

8. MASTER AND SERVANT. Compensation decree to father and stepmother jointly held harmless.

In a suit under the Workmen's Compensation Act (Acts 1919, chapter 123), by father and stepmother for death of son, a decree

for the plaintiffs jointly, though the stepmother was not a dependent, was not prejudicial to employer, where the father, if suit had been instituted in his name alone, would have been entitled to the full amount of the award under section 30. (*Post, pp.* 627, 628.)

## FROM HAMILTON.

Appeal from the Circuit Court of Hamilton County.— HON. OSCAR YARNELL, Judge.

W. H. WATKINS, for appellants.

ESTILL & BORK, for appellees.

MR. JUSTICE McKINNEY delivered the opinion of the Court.

This suit was instituted under the Workmen's Compensation Act, chapter 123 of the Acts of 1919, to recover damages for the death of Roberts Sanders, a boy 16 years of age.

In the lower court there was a judgment for the minimum sum provided by the act in a case of this kind, to wit, $5 per week for forty weeks, and from said judgment the chair company has appealed to this court and has assigned errors.

The deceased and his brother Fred had been in the employ of the chair company two and one-half days at the time of the injury, although they had previously worked for said company. They were to do such work as they

were called upon and directed to do by the foreman. The age of Fred does not appear in the record, but the evidence shows that he and Robert were the same size.

The accident, resulting in the injury and subsequent death of Robert, occurred about 11:45 in the morning. At the time these brothers were working in the finishing room on the third floor of the building, and were engaged in dipping chairs. These chairs were dipped in a tank into which liquid wax had been poured.

There was a room, about thirty feet from where they were working, cut off to itself by walls extending to the ceiling, and known as the "oil room." In this room were five or six barrels of varnish and liquid mineral wax. The highly combustible substances, such as naptha, benzene, gasoline, etc., were not kept in this room, but were kept in containers under the ground. This liquid wax was carried from the oil room in buckets and poured into the tank in which the chairs were dipped.

On the occasion in question the tank was empty, and the foreman directed Fred to get five or six buckets of wax and pour into the tank. At the time this order was given it appears that Robert was wiping chairs. The foreman assisted Robert in bringing the first bucket, and then left for some other part of the building. When he left Robert began assisting his brother in transferring the wax from the oil room to the tank. While Robert was in the oil room there was a combustion or explosion, resulting in a fire in the oil room, which set the clothing of Robert on fire, and he was so badly burned that he died that night.

It is insisted by the chair company that a negro boy named George Mayfield, in the employ of the chair company, struck a match and threw it in the oil room for the purpose of setting fire to Robert Sanders. And it appears that for this offense the negro boy has been convicted of murder in the criminal court of Hamilton county.

It will not be necessary to set out the first three assignments of error, as they are too general to be considered by the court.

The fourth, fifth, and sixth assignments of error raise the serious questions involved. They are as follows:

"Because the trial court erred in declining to hold that from the uncontroverted evidence in the case, the death occurring in this case arose out of and from an independent intervening felonious act of one George Mayfield to vent personal malice, spite, and vengeance, and was in no way caused by accident arising out of the employment and in the course of the employment within the scope and meaning of the Workmen's Compensation Act, chapter 123 of the Acts of 1919, upon which this suit is predicated, and that therefore no compensation should be allowed, and accordingly in declining to pronounce judgment in favor of defendant.

"Because the trial court erred in declining to hold that from the uncontroverted evidence in the case the deceased, Robert Sanders, had departed from and gone out of the scope of his employment at the time of his injuries sustained, and that therefore his death did not arise out of the employment and in the course of the employment, and

therefore no compensation could be allowed, and the trial court accordingly erred in declining to pronounce judgment for defendant.

"Because the trial court erred in declining to hold that from the uncontroverted evidence in the case there was no causal connection between the employment of Robert Sanders, deceased, and the felonious act of George Mayfield causing his death, and therefore the death did not arise out of the employment or in the course of the employment, and therefore no compensation should be allowed upon the ground that the death did not arise out of the employment or in the course of the employment, and accordingly the trial court erred in declining to pronounce final judgment for defendant."

For reasons hereinafter to be stated the evidence, as it appears in the transcript, is meager and unsatisfactory, and makes it rather difficult to determine the real facts which caused the injury resulting in the death of Robert Sanders. We here copy all of the evidence bearing upon the questions raised by the assignments of error set forth above.

Fred Sanders testified as follows:

"Q. Just tell what you know about your brother Robert Sanders meeting with an accident at the Milne Chair Company; were you working there first?

"A. I was in there.

"Q. Where were you?

"A. I was out there just coming out of the room.

"Q. Which room?

"A. Why, the room there, the oil room; I had just come out of there. We went there to get some of this wax stuff, so I went up to the room and we went in the oil room.

"Q. You had just come out of the oil room?

"A. Yes, sir.

"Q. Where was your brother?

"A. He was in there; we was going to the same place, and I was going in there.

"Q. What were you doing at that time?

"A. At that time we was toting that wax stuff to the tank we had run out.

"Q. What for?

"A. The tank where they dipped chairs.

"Q. Who told you to do that?

"A. Our boss.

"Q. Who was your boss? What was his name?

"A. Henry Kidwell.

"Q. Is that what you were paid to do?

"A. Yes, sir.

"Q. Is that what you were employed to do?

"A. Yes, we was supposed to dip chairs.

"Court: Ask him what his brother was doing.

"Q. What was he doing at the time he got burned?

"A. Well, he was toting this wax stuff, toting it out in a bucket.

"Q. What kind of wax stuff was that that he was tot-

"A. It was a preparation that they had there that they used to dip chairs in.

"Q. That was the kind of work that he was doing?

"A. Yes, sir.

"Q. What happened to him after he ran out of the room?-

"A. He went out through the room and he was burning, all on fire.

"Q. When you and Robert went up there to work, Mr. Kidwell put you to work at the dipping tank?

"A. Well, he put us to work doing something else.

"Q. Well, on the day of the accident you were working at this dipping tank dipping chairs in this liquid wax?

"A. Yes, sir.

"Q. This liquid wax was in one' corner of the room and was in vats in there, and it was a part of your business to take these pieces and dip them in this tank, up in the main room, and you were over there, you and Robert, standing there dipping these chairs in this wax?

"A. Yes, sir.

"Q. That is the stuff in this room in there where the fire occurred, and it was thick and heavy stuff like molasses, was it not, and it was just heavy varnish?

"A. It was just wax.

"Q. It was not like water?

"A. No, sir.

"Q. You were over there at that dipping tank and dipping these chairs in the tank?

"A. Yes, sir.

"Q. Now, shortly before the accident Mr. Kidwell came here where you and Robert were dipping these chairs in the tank and said 'to you, did he not, to go and take a bucket and bring some more of this wax out of the room there?

"A. Yes, sir.

"Q. He said that to you?

"A. Yes, sir.

"Q. He told Robert to stay there and keep dipping and told you to get the wax and bring it out there?

"A. Yes, sir; and he helped me.

"Q. You mean Mr. Kidwell?

"A. No, sir.

"Q. You mean Robert?

"A. Yes, sir.

"Q. Mr. Kidwell did not tell Robert to help you, but he told him to stay there, and then Robert went and helped you?

"A. Yes, sir.

"Q. When Robert went to help you, Mr. Kidwell was not there in the room, was he?

"A. No, sir.

"Q. So. Mr. Kidwell did tell you to go and get the wax, and after you went and got a bucket or two of it and Robert had stayed there at his work, then he went to help you bring the buckets of wax so that you could get it quicker?

"A. Yes, sir.

"Q. At the time the fire occurred you were standing at the tank?

"A. Yes, stirring; I had come out of the room and poured mine in there and was stirring it.

"Q. You were stirring?

"A. Yes, sir.

"Q. Robert had gone into the room to get a bucket full of wax to bring it to the tank?

"A. Yes, sir.

"Q. This negro Mayfield, George, Mayfield, did he work on the same floor?

"A. Yes, sir; dragging chairs.

"Q. Now just before the fire did you see this negro, Mayfield, with a match in his hand while you were there pouring or stirring?

"A. I saw him at the door; I never saw him with a match, and I saw him have something before the fire came out.

"Q. Did you not testify before Esq. Lawrence on the trial down there, and did you not testify in the criminal court during that trial, that you saw him with a match in his hand and saw him throw it; did you not state that?

"A. I saw him have something shut up in his hand.

"Q. Did you not say that you saw him have a match in his hand? Did you not say that both times?

"A. I saw him have something in his hand and saw him scratch it that way (indicating).

"Q. It was a match, was it not?

"A. He threw it up that way (indicating).

"Q. You saw him throw it or draw it up on his overalls, and he scratched the match on his overalls and threw it in the room?

"A. Yes, sir.

"Q. You saw him do that?

"A. Yes, sir.

"Q. He was standing right there at the door of the oil room when he threw that match, and right after that it flared up and a flame came out?

"A. Yes, sir.

"Q. Did you not hear this negro boy and Robert have some words that morning?

"A. No, sir.

"Q. Did you not hear them have some words with each other a day or two before that?

"A. No, sir; I never did hear them.

"Q. After the fire did you see that negro boy run?

"A. He just left the room and run down the steps.

"Q. And then you saw Robert running out of the room?

"A. Yes, I saw him hit the floor.

"Q. Robert was on fire?

"A. Yes, sir."

On redirect examination the witness testified as follows:

"Q. Fred, did you see anybody else running when that fire broke out there?

"A. Yes, sir.

"Q. Everybody else was running?

"A. Yes, sir.

"Q. How many were there on that floor when that fire broke out?

"A. I don't know just exactly.

"Q. About how many were there? How many people were there?

"A. When he got burned?

"Q. Yes, sir. How many people were there around there?

"A. Oh, they was nine or ten along there somewheres."

Henry Kidwell's testimony was as follows:

"Q. Were you foreman at the Milne Chair Company at the time that Robert Sanders was burned?

"A. Yes, sir.

"Q. Were you near him at the time he was burned?

"A. No, sir; I was in the upper end of the building when the fire happened.

"Q. How long before he was burned had you seen him?

"A. I seen him something like two or three minutes before.

"Q. Where was he?

"A. He was around the tank about thirty feet from the oil room door.

"Q. What was he doing?

"A. He was wiping chairs.

"Q. What kind of work was he supposed to do?

"A. Well, he was supposed to do anything—just anything that we had for him to do.

"Q. You were the man that told him what to do?

"A. Yes, sir.

"Q. It was a part of his work to bring this stuff, this wax or whatever you call it, from this oil room and put it in the tank, was it not, where the chairs were dipped?

"A. Well, Fred was the one that I told—I told him to carry the wax out.

"Q. Did you tell the other one to carry it out also?

"A. No, sir; I did not know their names apart; I could not tell them apart; I did not know their names apart. They was both about the same size, and I could not tell which was which, but this one here (pointing to Fred Sanders) is the one that I told to bring that out.

"Q. Did you not testify that they were both about the same size and that you could not say whether it was this boy here, the live one or the dead one, that you sent in the oil room?

"A. This here one was the one that I told. I did not know the dead one had gone in there to help him."

On redirect examination the witness testified as follows:

"Q. Did I understand you to say that when you left there one or both of the boys went into the oil room?

"A. No, sir.

"Q. How was that?

"A. This boy came back there where I was at the tank —they was both at the tank, and I told that boy to take a bucket and go in there and get some of that wax and fill up the tank with it.

"Q. Where was the one that got burned?

"A. He was wiping chairs and that one was standing there dipping chairs.

Milne v. Sanders.

"Q. One of them was standing there by the tank dipping chairs, and the other one was wiping chairs?

"A. Yes, the other one was wiping chairs, and I told him to take a bucket and go in the oil room and get some of this wax and put it in this tank, and then I went away up to the upper end of the room.

"Q. How many buckets did he put in the tank?

"A. I told him to put in about four or five buckets full, and then I started off to my work.

"Q. Did you specify how near full it should be?

"A. No, sir.

"Q. They were standing there, and you did not tell the other one to help him, the one that was wiping chairs at that time?

"A. No, sir; I then came up there, went to the upper end of the room.

"Q. What did you say to them? (Objected to.)

"Q. What did you say to him, just the exact words that you used to him?

"A. I told him—I just told him to get a bucket and get in there and fill up the tank."

On recross-examination the witness testified as follows:

"Q. You told Fred, this boy that did not get burned, to go in there and fill up the tank?

"A. That is what I told him.

"Q. This one sitting over here?

"A. Yes, sir.

"Q. The boy that was burned, you never did tell him anything?

"A. No, sir; he was wiping chairs there at the time.

"Q. You told the other one to go and bring this wax out?

"A. Yes, sir."

Bedford Mansel testified as follows:

"Q. I will ask you to state whether or not, a short time before this occurrence, you heard any words pass between this negro boy, George Mayfield, and Robert Sanders, the boy that was burned?

"A. Yes, I heard some words pass, but I did not understand what the words was; I heard them talking.

"Q. In what kind of a tone of voice were they talking?

"A. Loud voice, something like they was fussing, but I could not say whether they was or not.

"Q. Did you see that negro boy, George Mayfield, run out of the room?

"A. Not after the fire.

"Q. Did you see him at the door of the oil room before the fire?

"A. Yes, sir.

"Q. What was he doing at the door of the oil room when you saw him?

"A. Well, I saw Mr. Kidwell go in the oil room, and then I saw this boy go in there, and then Mr. Kidwell come out of the oil room, and I went on to the back end, and that is the last I saw of him.

"Q. You saw George Mayfield go in the oil room after Mr. Kidwell came out?

"A. Yes, sir.

Milne v. Sanders.

"Q. And then you never saw him any more?

"A. No, sir.

"Q. When you saw George Mayfield go in the oil room, was that just before the fire?

"A. Yes, sir; just before the fire."

L. L. Hammons testified as follows:

"Q. State whether or not you heard cursing inside the oil room?

"A. I heard, I could not state who it was, but I heard somebody say, 'God damn you.'

"Q. You heard somebody say, 'God damn you'?

"A. Yes, sir.

"Q. How long was it after that before you saw the flash?

"A. Just a few minutes.

"Q. I believe you say that you heard some grumbling in the oil room, going on in the oil room?

"A. Yes, sir.

"Q. Why could you not see in the oil room?

"A. Because there was a partition between me and the room.

"Q. And they were on the other side of the partition?

"A. I could not say that was in the room, but they was on the other side of the partition.

"Q. And then there was a flash and flames?

"A. Yes, sir.

"Q. State whether or not before the flash there was an explosion.

"A. Well, I would not say it was exactly an explosion; it was just a kind of a boom; sounded like some one had fired a shot.

"Q. Did you see that negro boy run out of there?

"A. No, sir.

"Q. Did you see Robert Sanders come out of the room?

"A. No, sir; I saw him after he was down along the archway upon the ground after he was burned."

Andrew Cavitt testified as follows:

"Q. State whether or not you saw this negro boy, Mayfield, with a match in his hand just before the fire?

"A. I seen him between seven and eight o'clock, somewheres along there.

"Q. With a match in his hand?

"A. Yes, sir.

"Q. Did you see him have one between that time and the time of the fire?

"A. No, sir."

On cross-examination this witness testified as follows:

"Q. It (wax) is highly inflammable and easy to burn, is it not?

"A. It will burn if you put a match to it or a blaze or anything like that.

"Q. It was necessary in carrying on the business of the Milne Chair Company to use that sort of material that they were using in their business?

"A. Yes, sir.

"Q. It is an inflammable liquid?

"A. Yes, sir."

Milne v. Sanders.

It is well settled in cases of this character that the circuit judge will not be reversed if there is any evidence to support his finding. Assuming that the deceased was acting within the scope of his employment at the time he was burned, is the evidence, detailed above, sufficient to show that the negro boy, George Mayfield, feloniously struck a match and threw it in the oil room for the purpose of burning the deceased? In other words, was the injury accidental, or was it the result of an intentional wrongful act on the part of a fellow servant?

As a general rule, where an employee is intentionally injured by a fellow servant, there is no liability. For example, if, while the deceased was dipping chairs, a fellow servant had accidentally dropped a hammer on his foot and crushed it, there would be liability; but where the fellow servant, in the circumstances, purposely crushed his foot with a hammer, there would be no liability.

The plaintiffs below having shown that a fire suddenly appeared in the oil room, which burned the deceased, the burden then shifted to the chair company to show that the fire occurred as claimed by it.

After carefully considering the evidence, we are of the opinion that there is some evidence to sustain the finding of the trial court. The only witness who testified as to George Mayfield striking a match was Fred Sanders, and he testified both ways. He first testified that he did not see the boy have a match, and later he answered a question which suggested the lighting and throwing of a match by George Mayfield in the affirmative.

But assuming that the evidence shows that George May-field was seen to strike and throw a match on the floor in the oil room, under the meager evidence contained in this record, can it be said that it was done maliciously for the purpose of burning the deceased? The record is silent as to the age of this negro boy. There is no evidence to show that he entertained malice or ill will towards the deceased. One witness says he heard them talking that morning; but that he cannot say that they were fussing.

There is no evidence to show that this negro boy was acquainted with this oil room, or that he knew that if he threw a lighted match on the floor it would start a con-flagration. Some boys are possessed of a great deal of curiosity, and it could be as well assumed, on this record, that his object was to see whether a match would start a fire as to assume that he was trying to burn the deceased. The foreman had told him about 7:30 or eight o'clock that morning that it was dangerous to strike matches in that building, and this may have incited him to make an ex-periment.

We are unable to say, upon this record, that all of the evidence shows that he struck and threw a lighted match on the floor of the oil room, or, if he did so, that it was for the malicious purpose of burning Robert Sanders. The evidence was not well developed along this line. We would hardly be expected to assume, in the absence of some forci-ble testimony, that this boy intended to kill Robert Sanders and destroy the chair factory.

Assuming, therefore, that this was an accidental fire, or at least that the negro boy did not maliciously try to burn the deceased, even though he threw a lighted match in the oil room, we are then confronted with the query: Did the death of the deceased arise "out of" and "in the course of" his employment?

These two brothers were employed to do no particular work, but such work as they were directed to do, from time to time, by the foreman. On the day of the accident they were dipping chairs. The tank being empty, the foreman directed one of the brothers to take a bucket and bring wax from the oil room, thirty feet away, and fill the tank. Likely he did not direct Robert to assist for the reason that he was wiping chairs at the time. There is nothing to show that wiping chairs was a part of Robert's duty, or he may have finished. In any event, shortly after the order was given to his brother, Robert joined his brother and began assisting him in filling the tank with wax, which would have resulted ordinarily in enabling them to resume their regular work sooner. There is no claim that the foreman forbade Robert from assisting his brother in this task, or from entering this oil room, or that Robert was intermeddling with something outside of his employment. These boys were the same size, engaged in doing the same work, and the foreman did not know one of the brothers from the other. Transporting the wax from the oil room was not a hazardous task requiring skill or experience, and it could have been done by Robert as well as by Fred. These boys could not dip chairs without there

being wax in the tank, and transferring wax from the oil room to the tank was an incident of the work that they were engaged in, and, in the absence of a prohibition, under the facts of this case, and giving the section of the act in question a liberal construction, as the authorities say must be done, we are of the opinion that the deceased had not departed from or gone out of the scope of his employment at the time of his injury. We will here refer to a few cases to illustrate the principle involved.

In *Bischoff* v. *American Car, etc., Co.,* 190 Mich., 234, 157 N. W., 36, the court said:

"If a workman, when there is no emergency, should, of his own volition, see fit to intermeddle with something entirely outside the work for which he is employed, he ought not to be allowed compensation upon the mere plea that he thought his act would be for the benefit of his employer. That plea may be of value under some circumstances, but it cannot authorize an employe to voluntarily take upon himself the performance of work for which he was not employed."

In *Spooner* v. *Detroit Saturday Night Co.,* 187 Mich., 125, 153 N. W., 657, L. R. A., 1916A, 17, it was held that where one who was employed to operate an engine and a dynamo in the basement went to one of the upper floors and there volunteered to take some other workmen to the floor above in the elevator as a personal favor to them, and was killed while doing so, his death did not result from injuries arising out of, and in the course of, his employment, and the master is not liable therefor under the Workmen's Compensation Act.

On the other hand, in A Corpus Juris Treatise on the Workmen's Compensation Act, p. 82, the author says:

"But if a workman departs temporarily from his usual vocation to perform some act necessary to be done by some one for his master, he does not cease to be acting in the course of his employment."

In note (b) to the foregoing text appears the following:

"Illustrations.— (1) Act of stoker in attempting to replace bolt of fuel conveyor. *McCormick* v. *A. T. Kelliher Lumber Co.,* 18 B. C. 57, 9 DomLR, 392, 23 WestLR., 10, 7 BWCC, 1025 (dism. app. 7 DomLR, 732) (applying 4 DomLR, 657). (2) Accident to a laborer employed in a steam joinery shop, whose duties were not connected with the management of the machinery, while assisting a machineman to replace some loose belting on the machinery while in motion. *McQuibban* v. *Menzies,* 37 Sc. L. Rep., 526. (3) A boy employed in the respondents' boot factory was engaged at his ordinary work on a machine in the finishing room on the upper story. By the factory regulations the hands were forbidden to change from one machine to another. An imperfectly molded insole was brought up among others to the finishing room from the ground floor. An overseer directed the boy to bring the insole downstairs and to have it remolded. The boy had not been expressly forbidden to touch the molding machine. The operator in charge of this machine was temporarily absent and the boy did not wait for his return, but

attempted to remold the sole himself, and in doing so received injuries which resulted in the loss of three fingers. It was held that the boy was entitled to compensation. *Tobin* v. *Hearn,* (1910), 2 Ir., 639."

In A Corpus Juris Treatise, referred to above, page 72, it is said:

"Distinction Between Terms.—The expressions 'arising out of' and 'in the course of' the employment are not synonymous, but the words 'arising out of' are construed to refer to the origin or cause of the injury, and the words 'in the course of' to refer to the time, place, and circumstances under which it occurred. An injury which occurs in the course of the employment will ordinarily, but not necessarily, arise out of it, while an injury arising out of any employment almost necessarily occurs in the course of it.

"In determining whether an accident arose out of and in the course of the employment, each case must be decided with reference to its own attendant circumstances, and it has indeed been stated rather broadly but by eminent authority that argument by analogy is valueless."

Assuming that the fire was accidental, had Fred Sanders been burned, it would be apparent that his injury arose "out of" and "in the course of" his employment.

We are of the opinion that the deceased, Robert Sanders, had not departed from or gone out of the scope of his employment at the time of his injuries, and hence the company is liable under the act in question.

The next assignment of error goes to the action of the trial court in excluding evidence as to statements made by the deceased to the effect that the negro boy was responsible for his injury; also as to the action of the court in excluding the record in the criminal case, in which George Mayfield was convicted for the murder of Robert Sanders. It is insisted that the statements of the deceased should have been admitted as dying declarations.

Assuming that the statements constituted dying declarations, we are of the opinion that such declarations are not admissible in a civil action.

In Jones on Evidence, pp. 411, 412, 413, it is said:

"(Dying declarations) are declarations made by the victims in cases of homicide where the death of the deceased is the subject of a charge, and the circumstances and cause of the death are the subject of the dying declarations. . . . Although there was formerly some doubt as to the proposition, it is now well settled that the declarations are admissible only in cases of homicide. Thus they have been rejected in an indictment for administering drugs with intent to procure an abortion, although death resulted from the act, as well as in a trial for perjury or robbery, and in civil actions generally, although such actions are for the injury causing the death."

In Greenleaf on Evidence (16th Ed.), pp. 245, 246, it is said:

"It was one time held by respectable authorities that this general principle warranted the admission of dying declarations in all cases, civil and criminal, but it is now

143 Tenn.—40

well settled that they are admissible as such only in cases of homicide where the death of the deceased is the subject of the charge, and the circumstances of the death are the subject of the dying declarations. As to the issue the declaration is not admissible in a civil case."

We are of the opinion that the court properly excluded the transcript of the record in the criminal case.

The plaintiffs in the present case were not parties to the criminal case, had no opportunity to cross-examine witnesses in the latter case, nor to introduce evidence to rebut that offered by the state. Furthermore, the dying declarations of the deceased were competent in the criminal case, while incompetent in this case.

In Bigelow on Estoppel, pp. 129, 130, it is said:

"The point in *Petric* v. *Nuttall* is well settled. Judgments in criminal cases are rendered between the State and the defendant; they are not binding in civil cases, though the defendant or the State be there a party, either for or against such party, for want of mutuality."

We are further of the opinion that the circuit judge committed no error in correcting his judgment.

This suit was instituted by the father and stepmother of the deceased, and a joint judgment was rendered in their favor.

It is insisted that the stepmother is not a dependent according to the provisions of the act, and for this reason the judgment should be reversed.

Conceding that the stepmother is not a dependent, it is provided by section 30 of the act that the father shall be

Milne v. Sanders.

conclusively presumed to be wholly dependent. Under the minimum allowances provided by the act, had the suit been in the name of the father alone, he would have been allowed $5 per week for forty weeks, the sum that was decreed the father and stepmother jointly herein, so that the Chair Company has not been prejudiced or injured in this respect, and if this is an error it is a harmless one.

It results that the judgment of the circuit court will be affirmed.