CENTRAL FRANKLIN PROCESS CO. *v.* GANN.

(*Knoxville*, September Term, 1939.)

Opinion filed November 25, 1939.

Hodges & Doughty, of Knoxville, for plaintiff in error.

JAC CHAMBLISS and CLARENCE KOLWYCK, both of Chattanooga, for defendant in error.

MR. SPECIAL JUSTICE W. T. KENNERLY delivered the opinion of the Court.

The parties will be referred to as petitioner and defendant, according to their status in the trial Court.

This is a suit by the petitioner, Mrs. Gann, against the Process Company, seeking to recover Workmen's Compensation for total and permanent disability. While in the employ of the defendant and in line of duty, the petitioner, on September 7, 1937, slipped upon an oily floor of defendant's manufacturing plant, falling heavily on her left side and left arm. Both bones of her left arm were broken at the wrist, and her left side and her left hip received painful injuries. As a result of these injuries petitioner was confined at her home, unable to return to work, until November 21, 1937. During that time she was treated by Dr. Reynolds, a physician employed by the defendant. At or about the time she returned to work, she was paid total disability benefits amounting to $72.38, for about eleven weeks disability.

The settlement of the question as to whether she had any permanent partial disability, and if so, the extent thereof, was postponed until a later date. In the meantime, the defendant required her to go to Dr. Campbell, another of its physicians and surgeons, for examination and treatment of her arm.

About three weeks after petitioner returned to work, her back and side began to pain her very acutely. Her suffering continued to increase, finally resulted in total disability, and she had to give up her job in the defendant's manufacturing plant. She thought this condition

of her back and side resulted from her injuries, but she was advised by Dr. Campbell this was not true. Dr. Campbell likewise so advised the defendant.

On June 24, 1938, Dr. Campbell made a written report to the effect that she had ten per cent partial permanent disability resulting from the injury to her left arm. The report concluded, "I feel certain that the sciatica of which she complains does not relate in any way to the accident." The condition of her back and side referred to had been diagnosed as sciatic rheumatism.

On July 9, 1938, petitioner was visited at her home by W. S. Buck, Adjuster for the Insurance Company carrying the risk of the defendant. Mr. Buck sought to make a settlement with the petitioner. Under Dr. Campbell's report she was entitled to partial permanent disability benefits for fourteen weeks subsequent to November 21, 1937, that being the date when she returned to work. He offered her $92.12, which added to the $72.38 theretofore paid her, would make a total of $164.50. The period of fourteen weeks of partial permanent disability had long expired. Mrs. Gann was not willing to settle at that time, stating that she thought the condition of her back and limb resulted from her fall. Mr. Buck assured her that it did not, stating it had no connection with her fall, and that Dr. Campbell had so reported.

Petitioner stated she wanted further time to consider the matter. On July the 15th, Mr. Buck returned and again made the positive statement that Dr. Campbell, an experienced and skilled physician, reported that petitioner's sciatic condition did not result from the fall.

He presented to her a form of release which he wanted her to sign, and petitioner and her husband testify he assured her that it covered only the injuries to her left arm, and not injuries to her hip and back. This re-

lease, bearing date July 15, 1938, stated that it was in consideration of $92.12 then paid, making in all with said previous payments, $164.50, "in full settlement of compensation . . . on account of injury, to-wit: fracture left radius and ulna resulting in ten per cent permanent disability of left hand resulting to Lou Rena Gann on or about September 7, 1937. . . . Said compensation dating from September 8, 1937, to full, final and complete settlement and being in amount $164.50."

The release, as required by law, provided that before it became effective it must be approved by the Circuit Judge. Mr. Buck arranged with the petitioner and her husband for them to meet him the next day at the Circuit Court Clerk's office for approval of this settlement.

At the appointed hour, petitioner and her husband met Mr. Buck and an attorney for the defendant at the Circuit Court Clerk's office, where a petition which had already been prepared was presented to petitioner, and she was requested to verify it by affidavit. Petitioner was at that time suffering intense pain in her back and limb. She and her husband had a discussion with Mr. Buck about the condition of her back, and were again assured that Dr. Campbell advised and reported that her sciatic condition did not result from the accident.

After a brief time, Circuit Judge Yarnell came into the Clerk's office. He did not formally open court. Petitioner was not represented by counsel. Judge Yarnell read the petition hastily, or the contents of it were stated to him. He asked petitioner if the settlement met with her approval, and she stated that it did so far as it covered injuries to her arm, but that she was suffering pain in her back and limb which she thought resulted from the injury. Thereupon, the attorney for defendant presented to the Court the written statement, unsworn to, of Dr.

Campbell above referred to. The judge stated that Dr. Campbell was a capable and reliable physician, and giving credit to this statement, he approved the settlement. No evidence was heard. The hearing was most informal and very brief. The order was entered on July 16, 1938.

The petitioner's condition continued to grow worse, and on August 15th—that being the thirtieth day after the entry of the order aforesaid—she went to Dr. Marchbanks, a radiologist, and had X-ray pictures taken of her back. These pictures showed that she was suffering from arthritis affecting the lower joints of her vertebra, and the resulting deposits in the joints of the lower vertebra were impinging upon the sciatic nerves, thus producing sciatic rheumatism in her back and left leg. She was advised this condition was permanent, and that it resulted, no doubt, from the traumatic injuries which she received in the fall. This was the first definite information given her by a physician that the condition aforesaid resulted from her said injuries.

The next day petitioner's husband advised one of the officials of the defendant of Dr. Marchbanks' diagnosis, and made demand for payment of additional compensation. The official, in Mr. Gann's presence, dictated a letter to the insurance company covering the risk, reporting what Mr. Gann had advised. The insurance company never thereafter communicated with the petitioner or her husband.

On or about September 1st, petitioner and her husband first consulted counsel and were advised as to petitioner's rights. Counsel thereupon prepared a petition addressed to the Judge of the Circuit Court, seeking to have the order approving the settlement re-considered, vacated, and a new hearing had. This petition was filed on September 1st.

It was averred in the petition that in the fall aforesaid, petitioner received not only injuries to her left arm, but "a severe and painful injury to her left hip and back, in that the bones and muscles of her hip and back were jarred, sprained and dislocated severely. . . . That the injury to her back was not immediately apparent, and she went back to work on or about November 21, 1937, . . . but that the pain in her back became progressively worse until finally, some three or four months ago she had to cease her work on account of the pain therein. Petitioner respectfully shows that at that time she had pending the matter of settlement of a total partial disability to her left arm, and she was examined by medical counsel for the Central Franklin Process Company both for the injury to her left arm and for the injury to her back, which injury had become severe. . . . That she was advised at that time by the medical representative of the Central Franklin Process Company that the condition of her back and hip could not be attributed to the accident which she had, and that the company was not liable for that condition, and it was entirely independent of her fall which she had suffered on September 7, 1937. Petitioner was suffering excruciating pain on account of the condition in her back at the time, (referring to the date of the settlement) but relying solely on the statements of fact made to her by the medical representative of the company, she agreed to accept the sum $92.12 for disability to her arm, being unequivocally advised that the condition in her back had no connection with the accident. . . . Since the original order in this cause was entered she has gone to other medical authorities who have examined her and X-rayed her, and who now advise her positively that the condition of her back is due solely to the accident.

. . . Accordingly, petitioner alleges that she entered into the settlement agreement while under a mistake of facts, and into which she was led by defendant's representatives, and the sum of $92.12 which she received as compensation for permanent partial disability to her arm is grossly inadequate to compensate her for her injury, which she now avers has resulted in her total and permanent disability.''

The prayer was for the vacating of the aforesaid order, a hearing, and she be granted such relief as she might be entitled to.

The petition was filed more than thirty days after the order of July 16th.

The defendant filed a plea in abatement averring that her compensation was for a period of less than six months, the settlement was final and the claim not subject to re-adjustment, and the order of July 16, 1938, was entered more than thirty days before the petition was filed.

On December 10, 1938, the Court acted on the plea in abatement, holding that it should be sustained, but petitioner having made a motion that her petition in the alternative be treated as an application for writ of error *coram nobis*, it was so ordered, and thereafter this petition stood as a petition for the writ aforesaid.

Defendant then demurred to the petition, seeking a writ of error *coram nobis*. The grounds of the demurrer are, since the settlement was for a period of less than six months, the settlement was final and not subject to review or re-adjustment. Further, the petition disclosed petitioner appeared before the Circuit Judge and testified as to the facts concerning her disability, and there having been a trial and a finding of facts, such findings were conclusive in the absence of fraud, and petitioner

could not avail herself of the remedy afforded by a writ of error *coram nobis.*

This demurrer was overruled, with permission to the defendant to rely on it at the hearing. Defendant then answered. The material averments of the answer are:

1. Petition for writ of error *coram nobis* did not lie, because when the original petition was filed and presented to the Circuit Judge, petitioner and her husband appeared with defendant's attorney at the Clerk's office, and both of them read over the petition theretofore prepared, and petitioner made affidavit to the correctness of its averments; the parties then appeared before the Judge and it was explained to him that the matter about to be presented was for approval of a final settlement under the Workmen's Compensation Act; the Judge took the papers and examined them, and then inquired of Mr. and Mrs. Gann if they agreed to the settlement on the basis set forth. Mr. Gann replied that Mrs. Gann had a back injury which resulted from her fall, and she was suffering pain in her back. Petitioner then spoke of this pain.

2. It is further averred that the attorney for the defendant stated to the Court he had a letter from Dr. Earl Campbell, who had treated Mrs. Gann, which stated the back injury did not result from the fall. Petitioner and her husband stated they disagreed with this conclusion. The letter of Dr. Campbell was presented to the Court, who stated "Dr. Campbell is a good and honest doctor, and what he says would be controlling. If you want to enter into this agreement, I will approve it."

3. It is then denied that the condition of petitioner's back resulted from the accident in question. This admission was made in the answer. "It is true that the petitioner was advised by the medical representative, name-

ly, Dr. Earl Campbell, that the condition of her back was not due to the accident sustained by her on September 7, 1937.''

4. It was further averred that she had had ample opportunity to consult other physicians and ascertain whether Dr. Campbell's opinion was erroneous.

The case was head on or about June 1, 1939, and at the hearing petitioner was permitted to amend the petition, averring that at the time this settlement was made she was advised by Mr. Buck, the Adjuster, that she was settling only for injuries to her left arm, and not for injuries to her back, and that she was then suffering excruciating pain and not in a mental condition to protect herself, and again specifically averring that she signed the statement without the advice or assistance of counsel, and when she was acting, ''under a mistake of fact, into which she was led by defendant's representatives.''

Upon the final hearing on oral testimony, the Court again overruled defendant's demurrer and sustained the petition for writ of error *coram nobis,* holding that the settlement should be set aside. It was further held that petitioner was permanently and totally disabled within the meaning of the Compensation Act, and she was awarded compensation at the rate of $6.58 per week for four hundred weeks, and at $5 per week for an additional one hundred and fifty weeks, this recovery to be credited by the payments theretofore made.

Motion for new trial was filed, overruled, an appeal prayed, granted and perfected to this Court.

The following errors are assigned:

1. The erroneous overruling of the demurrer.

2. The entry of the judgment in favor of petitioner

because there was no evidence to support the lower Court's finding and judgment.

3. It was erroneous to award compensation from and after June 4, 1938, instead of from September 7, 1937.

It is shown by the great weight of the evidence that for some years before the accident petitioner had been in good health and was a strong, robust woman, working regularly every day, with no trouble or pain connected with her back.

That about three weeks after her return to work on November 21st, her back began to pain her, this pain beginning at the base of the spine and running down her left side to her left hip and limb. This trouble progressively became worse until she was forced to go to bed in March, 1938. At Christmas, 1937, she "could hardly get up and down".

The reason she gave for not sooner reporting her back injury to the defendant and Dr. Campbell when she was examined and treated by Dr. Campbell, is that when she went to see the doctor about her arm, she would have to sit in his office so long waiting for attention that she would become worn out, and having had so much trouble with her arm, she was afraid if she mentioned her back she would be laid off or discharged, and thereby lose her job, stating "I did not know how things would be, and I had had so much trouble with my arm I was afraid they would lay me off and I would lose my job."

Dr. Campbell's last examination on June 24, 1938, was so painful, and petitioner was suffering to such an extent the doctor had to give her morphine to ease her pain. He so states in his report, "Patient complained of so much pain over the sciatic nerve that it was neces-

sary to give her one-fourth grain of morphine for relief.''

It is further established that although she had been to two other physicians before going to Dr. Marchbanks, neither of them diagnosed her condition as resulting from her fall, and she was not so advised. One of these doctors was not equipped for an X-ray examination.

Petitioner's husband, who was present when the petition was presented to Judge Yarnell, testified that he felt his wife's trouble in her back resulted from the fall, ''but I could not say anything after what Dr. Campbell said. I was going by his word.''

''Q.  Did you know at that time what was causing the trouble with her back?

''A.  No sir, I did not know.

''Q.  If you believed this, Paul, why was it you acquiesced in her making this particular settlement that you did make?

''A.  Because Dr. Campbell said it was not due to the fall, and Mr. Buck said it did not have anything to do with her back.

''Q.  Said that the settlement didn't?

''A.  Said the papers she was signing did not have anything to do with her back at all.

''Q.  And so far as you could tell from reading them, they did not have?

''A.  No sir.''

A number of very eminent and well qualified physicians testified.  They are all in accord that petitioner's present condition is due to arthritis in the joints of the lower vertebra. This arthritis has resulted in the depositing or building up of a hard substance in the joints between the vertebra.  The sciatic nerves spring off from the spinal cord and pass out through these joints.  The

doctors are in agreement that petitioner's condition results from the pressure on these sciatic nerves.

The physicians further agree that arthritis of this character results from two known causes, an infection somewhere in the body, or a traumatic injury.

None of the physicians who have examined petitioner so many times and so thoroughly have been able to find any focus of infection anywhere in the body, and the weight of the testimony is that the injury to petitioner's left hip and side resulting in the wrenching and shock caused the arthritic condition and that it has been progressive. The weight of the proof shows that arthritis resulting from trauma progresses slowly, which accounts for the fact that petitioner was able to work for some two or three months after she returned on November 21st. In this connection the proof shows that on account of her suffering plaintiff would frequently not report for work from Thursday until Monday, remaining in bed during this time.

Typical of the opinions expressed by petitioner's physicians is the following by Dr. R. O. Curry, who treated petitioner for several months:

"Q. What was the effect of that X-ray on your opinion as to what caused that condition in her back? (This referred to Dr. Marchbanks' X-rays in August, 1938).

"A. My opinion was it was due to traumatism because she had, down the articular surfaces of the vertebra on that side—she had shadow—and reading the pictures, she had traumatism or something there, and following the history of the fall we consider it was traumatism, that was my opinion. . . . My diagnosis was traumatic arthritis. . . . The way we arrived at our diagnosis, she was thrown in a careen over like that (illustrating) with such force that brought this irritation

about. That was our conclusion, just like you sprain your foot or ankle by turning it over.''

Dr. T. B. Bogart, called by the defendant, testified ''Traumatic arthritis develops slowly.''

No specific charge of fraud is made in the petition. The defendant's attorneys in the lower Court, Messrs. Fletcher & Fletcher, are specifically exonerated by opposing counsel of attempting to perpetrate any fraud on the petitioner. They no doubt believed the statement in Dr. Campbell's report.

There can be no doubt that had all the facts been developed at a hearing before Judge Yarnell, he would have refused to approve this settlement. There can be no doubt that the Court, the defendant and the petitioner were misled by the erroneous report of Dr. Campbell. This was a mistake of fact. The only remedy available to the petitioner was a writ of error *coram nobis*. When her condition was discovered by Dr. Marchbanks thirty days after the order of July 16th, the Court had lost control of the matter. No error of law had been committed. The order approving the settlement was an error based upon mistaken fact.

Our Statutes applying to this seldom used writ are:

''Any person aggrieved by the judgment of the county, circuit, chancery or special court, by reason of a material error in fact, may reverse the same upon writ of error *coram nobis*, as herein provided.'' Code, Section 8971.

''The relief embraced in this article is confined to errors of fact occurring in proceedings of which the person seeking relief has had no notice, or which he was prevented by disability from showing or correcting, or in which he was prevented from making defense by surprise, accident, mistake, or fraud, without fault on his part.'' Code, Section 8977.

No fault in this case can be attributed to the petitioner. She knew that she had something wrong with her back. She had been examined and treated by two physicians in the employ of the defendant, Dr. Reynolds and Dr. Campbell. Both of them had advised her that she was suffering from sciatica resulting from arthritis, but neither of them had advised her this condition resulted from the accident. She had been examined and treated by two physicians of her own selection, neither of whom had advised her condition was the result of the fall. She was not advised that such was the fact until X-rayed by Dr. Marchbanks, which was after the settlement was made. She immediaetly notified the defendant of this advice. It notified the insurance company carrying this risk. Neither the insurance company nor the defendant further contacted her with a view of remedying the mistake theretofore made. Within two weeks she filed her petition. Up to that time she had not had the benefit of legal advice.

The writ of error *coram nobis* is one of the oldest writs known to the English Common Law. Blackstone refers to it as a "writ of most remedial nature which seems to have been invented lest in any way there should be an oppressive defeat of justice." 2 Cooley's Blackstone, 404. "It is a very ancient remedy and is so called from its being founded on the record of the case which was stated in the writ to remain in the court, coram nobis, . . . . The Court in which the judgment complained of was given. It lies for errors of fact only, which are not the errors of the judges." *Crawford* v. *Williams,* 31 Tenn. (1 Swan), 341; *Patterson* v. *Arnold,* 44 Tenn. (4 Cold.), 364.

In *Bolling et al.* v. *Huddleston et al.,* 8 Tenn. Civ. App. (8 Higgins), 339, 341, *certiorari* denied by this

Court, Mr. Justice Chambliss, now of this Court, then serving as a Special Justice of the Court of Civil Appeals, thus stated the rule: "It is difficult to lay down any hard and fast rule as to exactly what state of facts will bring a petitioner within this limitation. To more or less extent, every case stands upon its own facts. However, as already intimated, whenever it appears that the petitioner has a meritorious defense which he has for any reason failed to have an opportunity to make on the trial, we are inclined to the opinion that he is entitled to a construction as favorable as is consistent with the provisions of the statute of the allegations made by the petitioner by which he seeks to show surprise, accident, mistake or fraud without fault."

To like effect are *Tucker* v. *James,* 59 Tenn. (12 Heisk.), 333; *Jones* v. *Pearse,* 59 Tenn. (12 Heisk.), 281; *Anderson* v. *Hagge,* 3 Shannon Cas., 672; *Bigham* v. *Brewer,* 36 Tenn. (4 Sneed), 432; *Crouch* v. *Mullinix,* 48 Tenn. (1 Heisk.), 478.

█ The trial Judge, upon a consideration of all the evidence, has found that petitioner is permanently and totally disabled as the result of the accident in question, and that she was induced to enter into the settlement and the Circuit Judge was constrained to approve this settlement as a result of a mistake of fact. There is ample material evidence to sustain this finding, and this Court is precluded from reversing under the rule announced in *Cambria Coal Company* v. *Ault,* 166 Tenn., 567, 568, 64 S. W. (2d), 18: "The only question presented on this appeal from a compensation award in favor of petitioner, . . . , whose husband was adjudged in the trial court to have died as the result of an accident while employed in the mines of the coal company, is whether or not the death was the result of an accident, or resulted

from pre-existing disease. This is a question of fact, as to which the finding of the trial judge will not be disturbed by this court, if there is material evidence to support it.''

The cases of *Milne* v. *Sanders,* 143 Tenn., 602, 228 S. W., 702; *Diamond Coal Company* v. *Jackson,* 156 Tenn., 179, 299 S. W., 802; *Vester Gas Range & Mfg. Company* v. *Leonard,* 148 Tenn., 665, 257 S. W., 395, reaffirm this rule.

Upon review in this Court of the action of the trial court in cases presented under the Compensation Act, Code 1932, section 6851 et seq., the most favorable view in support of petitioner's claim must be accepted. *Vester Gas Range & Mfg. Company* v. *Leonard,* 148 Tenn., 665, 257 S. W., 395; *Bon Air Coal, etc., Corporation* v. *Johnson,* 153 Tenn., 255, 283 S. W., 447; *Knoxville Power, etc., Company* v. *Barnes,* 156 Tenn., 184, 299 S. W., 772.

The latest reported statement by this Court of this rule is found in *Templeton* v. *Wilson,* 174 Tenn., 68, 123 S. W. (2d), 824, 826, where this language was used, ''Counsel for the employer fail to regard the rule, so often emphasized, that this Court does not weigh the evidence, but looks to it only to see if the finding of the trial Court is supported by any material evidence.''

Applying these well established rules we find there is abundant evidence to sustain the action of the Circuit Court upon the facts of this case.

The Court correctly overruled the defendant's demurrer. The petition as originally filed and as later amended states a cause of action. The method adopted by the Circuit Court in fixing the amount of compensation and the date upon which it became payable, was correct.

In this Court the defendant has filed a written motion to amend the answer filed in the Circuit Court. By this proposed amendment it is averred that the notice required by the statute was not given to the defendant. This motion must be disallowed. We have no power to permit an amendment to be made in this court to pleadings filed in the lower court. It results that the judgment of the Circuit Court is affirmed, with cost.